IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARIO SCOTT,

    *Plaintiff*,

v.

UNITED PARCEL SERVICE, INC.

    *Defendant*.

Case No. 8:22-cv-01460-WEJ-JSS

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

Defendant United Parcel Service, Inc. (Ohio) ("UPS") files its Motion for Summary Judgment and Supporting Memorandum of Law pursuant to Federal Rule of Civil Procedure 56, Local Rule 3.01, and the Court's Scheduling Order (Dkt. No. 18) and, in support thereof, respectfully shows the following:

### I. INTRODUCTION AND PROCEDURAL BACKGROUND

1. UPS is the current employer of Plaintiff Mario Scott (African America, seniority date January 4, 2012). This is the second lawsuit Scott has filed against UPS. The first was filed on May 10, 2019 in the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida, but was removed to the United States District Court, Middle District of Florida, Tampa Division, under Case No. 8:19-cv-1363-CEH-SPF. Scott's claims in his first case were disparate treatment based on race and retaliation in violation of Chapter 760 of the Florida Statutes, both of which were based on his allegations that UPS improperly

1

disqualified him from its driving course for failing to abide by UPS's dress code, thus denying him the opportunity to become a driver. UPS filed a Motion for Summary Judgment, which was granted on September 28, 2021. (Ex. A, Order Granting Summary Judgment.)[1]

2.  In the present case, Scott has alleged three claims—(1) discrimination based on race in violation of Section 1981; (2) retaliation in violation of Section 1981; and (3) retaliation in violation of Chapter 760 of the Florida Statute and Title VII. (Dkt. No. 1.) These claims are based on his allegation that a non-African American employee with less seniority was promoted to a full-time driving position before Scott, and that UPS had retaliated against him for filing union grievances and filing an EEOC charge in 2018. UPS moved to dismiss Scott's retaliation claims (Dkt. No. 9), which the Court granted on September 2, 2022. (Dkt. No. 13.) Thus, only Scott's racial discrimination claim under Section 1981 remains.

3.  Scott's discrimination claim cannot survive summary judgment because he was not subjected to an adverse employment action—Scott did not receive the full-time driving position in January 2021 because UPS properly awarded it to Anthony Cantu (Hispanic, seniority date September 12, 2011) per the terms of the Collective Bargaining Agreement. (*See* Ex. B, F. Dore Decl. at ¶ 14.) Cantu had a higher seniority date than Scott. Scott did become a full-time driver

---

[1] Courts may take judicial notice of public records, including documents filed in another court. *Chambliss v. Brevard Cnty. Sheriff's Office*, 6:22-CV-44-PGB, RMN, 2023 WL 5302332, at *3 fn 8 (M.D. Fla. Aug. 17, 2023) (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999)).

later that same year, when he bid again, and, because he now had the highest seniority on the bid list, was awarded the position.

## II. Factual Background

### A. UPS's Policies Prohibit Workplace Discrimination

4. UPS is worldwide package delivery company, with locations throughout the world, including Tampa, Florida. (Ex. B, F. Dore Decl. at ¶ 3.) The International Brotherhood of Teamsters Union ("Teamsters") represents much of UPS's U.S.-based hourly workforce. (Ex. B, F. Dore Decl. at ¶ 3.) The collective bargaining agreement ("CBA") reached between the Teamsters and UPS outlines the various terms and conditions of employment that apply to covered bargaining-unit employees. (Ex. B-1, CBA Art. 36). At all times during his employment with UPS, Scott has been, and is still, a bargaining unit employee. (Ex. B, F. Dore Decl. at ¶ 5.)

5. As an employer, UPS strives to maintain a workplace free of unlawful discrimination, harassment, and retaliation and maintains a policy prohibiting such unlawful conduct. This policy is included in the CBA and publicized to all non-bargaining unit employees through UPS's Policy Book, and Code of Business Conduct. (Ex. B-1, CBA Art. 36; Ex. B-3, UPS Policy Book; Ex. B-4, Code of Business Conduct.)

### B. Seniority and the CBA

6. Most non-managerial employees' promotions are determined by their seniority dates—"Seniority, as measured by length of continuous service with the

Company, shall prevail at all times." (Ex. B, F. Dore Decl. at ¶ 7; Ex. B-2, Southern Supplement, Art. 48, § 1.) Seniority can only be broken "by discharge for cause, voluntary quit, layoff for a period of three (3) years from the last date of employment, failure to respond to notice of recall, or unauthorized leave of absence." (Ex. B, F. Dore Decl. at ¶ 7; Ex.B-2, Southern Supplement, Art. 48, § 2.)

7. UPS's CBA requires that vacant bargaining unit positions be posted internally for interested employees to "bid" on. (Ex. B, Dore Decl. ¶ 8; Ex. C, Scott Depo. 51:20-22; 52:5-10; 95:18-22.) Who is selected for these posted positions is determined through a bidding process and based on seniority. (Ex. B, F. Dore Decl. at ¶ 4; Ex. C, Scott Depo. 22:13-20; 26:3-13.) For example, if a driving position opens up, eligible union employees can sign their names on the "bid sheet," which indicates interest in that position. (Ex. B, F. Dore Decl. at ¶ 8.) Then, the employee who has signed the bid sheet with the most seniority is given the opportunity to qualify for the position. (Ex. B, F. Dore Decl. at ¶ 8; Ex. C, Scott Depo. 26:3-13.)

8. Job promotions within a position type, such as moving from one full-time driving position to another, do not always require that a bid sheet be posted. (Ex. B, F. Dore Decl. at ¶ 9.) Rather, in such circumstances, the center manager would approach the driver with the highest seniority and ask if he was interested in moving to a new position. (Ex. B, F. Dore Decl. at ¶ 9.)

C. *Scott's Employment History*

9. Scott was hired by UPS in October 2011 as preloader, working as a temporary employee during UPS's peak season at the Tampa Bayside Center. (Ex.

4

C, Scott Depo. 12:21-13:1.) Temporary peak season employment does not count towards an employee's seniority date. (Ex. B, F. Dore Decl. at ¶ 6.) Scott was then hired as a permanent part-time preloader in January 2012 and has worked at UPS at the Tampa Bayside Center ever since. (Ex. C, Scott Depo. at 13:2-7; 17:5-8; Ex. B-5, Scott's Employee History Profile.) January 4, 2012 is Scott's seniority date. (Ex. B-5, Scott's Employee History Profile; Ex. C, Scott Depo. at 22:21-22.)

10. UPS's package centers typically handle a far higher volume of packages during the year-end holiday season. (Ex. B, F. Dore Decl. at ¶ 11.) This "peak" season typically lasts from October 15 through January 15 of each calendar year. (*Id.*) During this time, UPS will hire additional seasonal workers, and will often offer its current employees opportunities to work longer hours or temporarily fill new roles to ensure these packages are delivered on time. (*Id.*)

11. Scott first drove for UPS as a peak season driver, when he bid on and was awarded a peak season Saturday Air Driver position in 2017. (Ex. B, F. Dore Decl. at ¶ 12; Ex. C, Scott Depo. at 14:22-24.) During that peak season, he also was permitted to deliver Ground packages as well. (Ex. B, F. Dore Decl. at ¶ 12.)

12. By mid-January 2018, peak season had ended and Scott's temporary position as a peak-season driver also came to an end. (*Id.* at ¶ 12.) Thus, Scott returned to his position as a part-time preloader. (*Id.*)

13. Later in 2018, however, several full-time Package Car Driver positions came open in the Bayside Center. (Ex. B, F. Dore Decl. at ¶ 16.) Again, per the CBA, these positions were listed on a bid sheet, and the most senior employees who bid

5

were given the opportunity to qualify, including, among others, Scott and Cantu. (Ex. B, F. Dore Decl. at ¶ 16.)

14. The qualifications for non-peak season driving positions are more stringent. Candidates must attend training courses, complete a thirty-day probationary period, and complete supervised rides. (Ex. B, F. Dore Decl. at ¶ 16.) Included in these requirements is a weeklong training course at one of UPS's Integrad training facilities. (*Id.*) These courses are more detailed and rigorous than the training held for peak season Drivers. (*Id.*) Scott attended this course but was disqualified for failing to comply with the uniform requirements.[2] (Ex. B, F. Dore Decl. at ¶ 17.)

15. Following his disqualification, Scott returned to his part-time Preloader position, and remained in that position until September 24, 2019, when he became an Article 22.4 Combination Driver ("Art. 22.4 Combo Driver"). (Ex. B, F. Dore Decl. at ¶ 17.) An Art. 22.4 Combo Driver is a position created by the CBA where employees in this position typically work Tuesday through Saturday, or Wednesday through Sunday, allowing regular drivers to take Saturday off. (Ex. B, F. Dore Decl. at ¶ 19; Ex. B-1, CBA at Art. 22.4; Ex. C, Scott Depo. 88:24-89:2[3].) These employees are primarily drivers but can be asked to help with loading

---

[2] Scott's disqualification from the driving course in 2018 was the subject of his previous lawsuit, which was dismissed on summary judgment. (Ex. A.)

[3] Scott mistakenly refers to his former position as an Art. 22.5 driver in his deposition testimony.

6

packages or other inside work. (Ex. B, F. Dore Decl. at ¶ 19.) They are guaranteed eight consecutive hours of straight time pay per day if reporting as scheduled. (*Id.*)

16. Full-Time Package Car Driver positions are not posted for bids; rather, the center manager will approach the driver in the center with the highest seniority and ask if they are interested in the position. (Ex. B, F. Dore Decl. at ¶ 21.) In early 2021, a Full-Time Package Car Driver position became open at the Bayside Hub. (Ex. B, F. Dore Decl. at ¶ 22.) Tom Teimer, then Tampa Bayside Center Business Manager, approached Anthony Cantu, who was, at the time, also an Art. 22.4 Combo Driver, and who was also the driver with the highest seniority in the center (seniority date September 12, 2011). (Ex. B, F. Dore Decl. at ¶¶ 15, 22; Ex. B-6, Cantu Employee History Profile.) Teimer asked Cantu if he was interested in becoming a Full-Time Package Driver, and Cantu accepted the position. (Ex. B, F. Dore Decl. at ¶ 22.) A few months later, in August 2021, another Full-Time Package Car Driver position became available. (*Id.*) This time, Teimer asked Scott if he was interested in the position, because he now had the highest seniority of qualified drivers. (*Id.*) Scott accepted the position and has been a Full-Time Package Driver ever since. (*Id.*; Ex. C, Scott Depo. at 60:13-15; 89:18-19.)

### III. SUPPORTING MEMORANDUM OF LAW

#### A. Summary Judgment Standard

Summary judgment is proper if UPS "shows no genuine dispute exists as to any material fact . . ." *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1265 (11th Cir. 2021) (citing FED. R. CIV. P. 56(a)). "A genuine issue of material fact exists 'if the

7

evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Edmondson v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1159 (11th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Sotolongo v. Ethicon, Inc.*, 591 F.Supp.3d 1242, 1248 (S.D. Fla. 2022), appeal dismissed, 22-11176-AA, 2022 WL 19428408 (11th Cir. 2022). The Court construes evidence "in the light most favorable to the nonmoving party" and draws "all reasonable inferences in that party's favor." *Id.* at 1248-49. The nonmoving party, however, "must offer more than a mere scintilla of evidence for its position; indeed the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Id.* at 1249. And the Court is not "constrained to accept all the nonmovant's factual characterizations and legal arguments." *Id.* (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994).

**B.     Scott cannot prevail on his discrimination claim under Section 1981 because he cannot make out a *prima facie* case.**

Scott's only remaining allegation contends that UPS's awarding Anthony Cantu the Full-Time Package Driver position before awarding it to Scott was a violation of Section 1981 and racially discriminatory. (Dkt. No. 1 at ¶¶ 19-23.) In order to survive summary judgment on this claim, Scott must satisfy the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Scott must first establish a *prima facie* case, showing that (1) he belongs to a protected class; (2) he was subjected to an adverse employment action; (3) his

employer treated similarly situated employees more favorably; and (4) that he was qualified to do the job. *Wesley v. Austal USA, LLC*, 776 Fed. Appx.638, 643 (11th Cir. 2019).

If Scott successfully meets his *prima facie* burden, the burden shifts to UPS to articulate a legitimate, non-discriminatory reason for the challenged actions. *Id.* Once UPS meets this burden, any "presumption of discrimination disappears …" *Powell v. Am. Remediation & Envtl., Inc.,* 618 F. App'x 974, 978 (11th Cir. 2015). At that point, the burden shifts back to Scott to "show that the employer's stated reasons were pretexts for unlawful discrimination." *Wesley*, 776 Fed. Appx. at 643. Finally, a Section 1981 claim "requires proof that race was a but-for cause of a termination." *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1014 (11th Cir. 2023). Should Scott fail to establish pretext by a preponderance of the evidence, summary judgment and dismissal with prejudice is warranted.

1. **Scott cannot show a *prima facie* case of discrimination because he was not entitled to the position under the collective bargaining agreement when it was offered to Anthony Cantu.**

While Scott can show that he is a member of a protected class, he cannot satisfy the remaining elements of his discrimination claim. First, to show that he suffered an "adverse employment action," Scott must show that the alleged action involves "a *serious and material* change in the terms, conditions, or privileges of employment." *Nash v. Palm Beach Cnty. Sch. Dist.*, 469 Fed. Appx. 712, 714 (11th Cir. 2012) (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001)) (emphasis in original). Significantly, the employee's "subjective view of the

9

significance of the adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id*.

Here, Scott alleges he suffered an adverse employment action because "he was overlooked for a full-driver position that should have been awarded to him based on the company's seniority system." (Dkt. No. 1, Complaint at ¶ 22.) Cantu had a seniority date of September 12, 2011, which meant he has more seniority than Scott (seniority date: January 4, 2012). (Ex. B, F. Dore Decl. at ¶¶ 14-15.) And, as this Court noted in its Order dismissing Scott's retaliation claims, "if Plaintiff was not truly entitled to the full-time driver position under the collective bargaining agreement, then he has not alleged an adverse employment action." *Scott v. United Parcel Service, Inc.* (M.D. Fla., Sept. 2, 2022, No. 8:22-CV-1460-WFJ-JSS) 2022 WL 4017064, at *3).

Thus, Scott's argument hinges on his mistaken belief that Cantu should have been disqualified for one year because he had been in a car accident. (Ex. C, Scott Depo. at 38:9-10; 91:18-25.) Scott's argument fails for two reasons. First, per the CBA, vehicle accidents are not a condition that can break seniority. (Ex. B-2, Southern Suppl. at Art. 28, Section 2; Ex. C, Scott Depo. at 102:2-14.) Second, Scott has acknowledged that he has no evidence of Cantu's accident, nor does he recall when the alleged accident was. (Ex. C, Scott Depo. at 49:12-23.) In fact, Cantu's Motor Vehicle Driver Certification, which is dated March 5, 2021, acknowledges that Cantu's driver's license was violation-free for the prior twelve

10

months, including the months preceding his being awarded the Full Time Package Driver position. (Ex. B-7, Cantu's Motor Vehicle Driver Certification.) Scott therefore cannot show any evidence to support his claim, let alone that would permit a jury to reasonably find on his behalf.

Furthermore, Scott cannot show that Cantu was treated more favorably than him because UPS simply followed the guidelines of the CBA and offered the employee with the highest seniority (Cantu) the Full-Time Package Driver position when it became available in January.

Finally, because one of the qualifications for the position, per the CBA, is that the position be first offered to the driver with the highest seniority, Scott cannot show that he was qualified for the position when it opened in January 2021. He finally satisfied all the necessary qualifications, including highest seniority, when the position was offered to him in August 2021.

### 2. Scott cannot show that UPS's following the seniority system was pretext for racial discrimination.

Even if this court were to find that Scott's not being awarded the Full-Time Package Driver position while having less seniority than Cantu was sufficient to establish a *prima facie* case, Scott's claim still fails because UPS had a legitimate, nondiscriminatory reason for promoting Cantu first. Specifically, UPS was compelled by the CBA to award the position to the qualified employee with the highest seniority and who was otherwise qualified for the full-time driving position. (Ex. B, F. Dore Decl. at ¶¶ 9, 21-22.) Because Scott has no evidence to

11

show that Cantu was disqualified when he bid (he was not), the burden shifts back to Scott to show that UPS's following the terms of the CBA was simply pretext for racial discrimination, but he cannot possibly show any racial animus on UPS's part.

First, Scott testified that he does not know who made the decision to promote Cantu to a full-time driving position in January of 2021. (Ex. C, Scott Depo. at 117:11-14.) Indeed, when asked why Cantu received the Full-Time Driving position over him, Scott testified that he was "not going to speculate." (Ex. C, Scott Depo. at 110:8-15.) Later, he stated that he felt the decision was discriminatory because "[Cantu's] white and I'm black." (Ex. C, Scott Depo. at 117:4-10.) But "[s]peculation does not create a *genuine* issue of fact." *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (emphasis in original). Thus, Scott cannot establish discriminatory motive.

Scott further testified that Business Manager Teimer never made racially discriminatory comments to him, and indeed, the only alleged discriminatory conduct he referenced was from 2017, when he claimed that Teimer discriminated against him by warning him that the Integrad driving course was run "like a bootcamp." (*Id.* at 66:2, 71: 20–72:5; 117:24–118:1.) The almost-four-year gap from the alleged discriminatory comments, and Cantu's being awarded the driving position, goes against any argument of pretext. *See Brown v. Synovus Fin. Corp.*, 783 Fed. Appx. 923, 930 (11th Cir. 2019) (holding that comments made a year before the alleged adverse action were too far removed to show pretext.) Furthermore, there is no evidence that Teimer made the decision to promote Cantu

12

over Scott, as Teimer had no decision-making ability in selecting the candidate. This is because the CBA **required** Teimer offer the job to Cantu, as he had the highest seniority, just as Teimer was **required** to offer Scott the next full-time driving position when Scott had the highest seniority. (Ex. B, F. Dore Decl. at ¶ 24.) In short, Scott does not have evidence sufficient to establish pretext, nor does he have sufficient evidence to show that, but-for his race, he would have been offered the position before Cantu. For this additional reason, summary judgment should be granted.

## IV. CONCLUSION & PRAYER

As outlined above, Scott's remaining discrimination claim cannot survive summary judgment. His case is built on nothing more than his own belief that the CBA should include rules that it does not, and his own speculative claim that his former manager discriminated against him. Without facts to support this claim, it is insufficient to support his Section 1981 claim. UPS's competent summary judgment evidence also shows that it had legitimate, non-discriminatory reasons for promoting Cantu first—that is, following the CBA and promoting based on who had more seniority first. And Scott cannot show that UPS's following of the CBA was pretextual for discrimination. In sum, this case comes down to an utter lack of evidence suggesting UPS's complained-of actions were motivated by any racial animus. For the multiple reasons set forth in more detail above, UPS accordingly prays that the Court grants its Motion for Summary Judgment and dismisses

Scott's lawsuit in its entirety. UPS also prays for the recovery of its taxable costs and any other relief to which it may be entitled.

        Respectfully submitted,

        /s/ *Laura C. Emadi*
        Laura C. Emadi
        (*Pro Hac Vice Granted*)
        Texas State Bar No. 24105838
        lemadi@sr-llp.com
        SCHMOYER REINHARD LLP
        8000 IH 10 West, Suite 1600
        San Antonio, Texas 78230
        PH: (210) 447-8033
        FX: (210) 447-8036

        and

        Brain Lerner (Fla. Bar No. 177202)
        blerner@kvllaw.com
        Kim Vaughan Lerner LLP
        312 SE 17th Street, Suite 300
        Fort Lauderdale, FL 33316
        Telephone: (954) 527-1115
        Facsimile: (954) 527-1116

        **ATTORNEYS FOR DEFENDANT UNITED PARCEL SERVICE, INC. (OHIO)**

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 23, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that a true and correct copy of the foregoing document was served via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing on all counsel or parties of record on the Service List below.

By: */s/ Laura C. Emadi*

**SERVICE LIST**

Jerry Girley
The Girly Law Firm, PA
117 E. Marks Street, Suite A
Orlando, FL 32803
Tel: (407) 540-9866
Fax: (407) 540-9867
phyllis@thegirleylawfirm.com
Attorney for Plaintiff