# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**MARIO SCOTT**,

    Plaintiff,

v.                                                Case No. 8:22-cv-1460-WFJ-JSS

**UNITED PARCEL SERVICE, INC.**,

    Defendant.

_____/

## ORDER

Before the Court is Defendant United Parcel Service, Inc.'s ("UPS") Motion for Summary Judgment (Dkt. 25). Plaintiff Mario Scott has responded in opposition (Dkt. 26). Upon careful consideration, the Court grants UPS's Motion and closes this case.

## BACKGROUND

Mr. Scott is an African American male currently employed by UPS as a full-time package car driver. In the instant action, he claims that UPS racially discriminated against him in violation of 42 U.S.C. § 1981 by first awarding the same position to another, non-African American employee named Anthony Cantu.[1] UPS maintains that it was merely following its seniority-based promotion procedure.

---

[1] While Mr. Scott contends that Mr. Cantu is White, Dkt. 26 at 1, and UPS claims that Mr. Cantu is Hispanic, Dkt. 25 at 2, the Court finds this distinction immaterial in light of the discussion below.

1

### I.     UPS and Union Employees

UPS is a global package delivery service which employs numerous hourly workers in the United States. Dkt. 25 at 3. A significant number of these hourly workers, including Mr. Scott, are represented by the International Brotherhood of Teamsters Union (the "Union"). Dkt. 25-11 at 7. And, at the heart of the Union's representation is the National Master United Parcel Service Agreement (the "collective bargaining agreement" or "CBA"), as well as the Teamsters Southern Region and United Parcel Service Supplemental Agreement (the "Southern Supplement"). *See generally* Dkt. 25-4; Dkt. 25-5.

The CBA and Southern Supplement generally provide for seniority-based promotion. Indeed, when it comes to bargaining unit positions, "[s]eniority, as measured by length of continuous service with [UPS], shall prevail . . . at all times." Dkt. 25-5 at 5. "Seniority shall be broken only by discharge for cause, voluntary quit, layoff for a period of three (3) years from the last date of employment, failure to respond to notice of recall, or unauthorized leave of absence." *Id.* at 6. Temporary seasonal employees hired during peak season (roughly October 15 and through January 15), however, "shall not accrue days towards seniority." *Id.* at 3.

The Southern Supplement further provides that "[UPS] will post all new permanent full-time openings immediately" for bargaining unit employees to bid on. *Id.* at 6. The parties agree that the most senior employee who bids on a posted job is

supposed to be given the opportunity to qualify for that position first. Dkt. 25 at 4; Dkt. 27 at 1. UPS nevertheless claims, and Mr. Scott disputes, that "[j]ob promotions within a position type, such as moving from one full-time driving position to another, do not always require that a bid sheet be posted." Dkt. 25-3 at 3. "[I]n such circumstances, the center manager [may allegedly] approach the driver with the highest seniority and ask if he [is] interested[.]" *Id.*

## II.     Mr. Scott's Employment History with UPS

Mr. Scott began working for UPS in October 2011 as a temporary peak season preloader. Dkt. 25-11 at 5. In January 2012, UPS hired him as a permanent part-time preloader at its Tampa Bay Center. *Id.* Mr. Scott has worked there ever since with a seniority date of January 4, 2012. Dkt. 25-8 at 2; Dkt. 25-11 at 8.

Mr. Scott's first opportunity to drive for UPS came in peak season of 2017. Dkt. 25-11 at 6. To qualify for this temporary position, Mr. Scott was required to attend and pass a three-day UPS driving school. *Id.* at 6–7. He did so around October 2017, and ultimately drove in this role until around February 2018. Mr. Scott then returned to his regular part-time preloader position. *Id.*

Later in the same year, multiple full-time driver positions became available. Dkt. 25 at 5. Mr. Scott bid for one of these jobs and was sent to a five-day UPS driving school for qualification. Dkt. 25-11 at 7. After a day or so, however, Mr. Scott was disqualified. *Id.* at 13. He claims that UPS's stated reasons for his

3

disqualification—a uniform infraction among things—were mere pretext for retaliation related to previously filed grievances. *Id.*

At the end of 2018 or the beginning of 2019, Mr. Scott took the full-time driver course once more. *Id.* at 16. He passed. And, on September 24, 2019, Mr. Scott became an "Article 22.4 Combination Driver" ("22.4 Driver"). Dkt. 25 at 6; Dkt. 25-11 at 24; Dkt. 25-8 at 1. These driver positions are full-time, but they do not follow a Monday through Friday schedule and purportedly come with less benefits. Dkt. 25-11 at 24.

In early 2021, a full-time (Monday through Friday) package car driver position opened up at the Tampa Bay Center. Dkt. 25 at 7. It was not posted for bids. *Id.* Instead, Tom Teimer, the former Business Manager at the Tampa Bay Center, approached Mr. Cantu and offered him the job. *Id.* Mr. Cantu promptly accepted. UPS claims that Mr. Cantu's seniority date is September 12, 2011 (approximately four months before Mr. Scott's). Dkt. 25-9 at 2. Mr. Scott claims that Mr. Cantu had been in an accident at some point during his time as a 22.4 driver, rendering him temporarily disqualified for the new full-time package car driver position that Mr. Teimer offered him. Dkt. 25-11 at 28.

In August 2021, another full-time package car driver position became available. Dkt. 25 at 7. Mr. Teimer approached Mr. Scott and offered him the job. *Id.* Mr. Scott accepted and still works for UPS in this position. *Id.*

4

### III. Mr. Scott's Litigation History with UPS

In May 2019, Mr. Scott filed a two-count complaint against UPS alleging racial discrimination under Florida's Civil Rights Act. *Scott v. United Parcel Serv.*, No. 8:19-CV-1363-CEH-SPF, 2021 WL 4442675, at *3 (M.D. Fla. Sept. 28, 2021). His first count alleged that "Victor Torres, a non-black co-worker with less seniority, was treated more favorably because he was permitted to become a full-time driver after attending only one driving course." *Id.* at *4. The presiding district court rejected this claim because "both Scott and Torres attended the second weeklong course" and Mr. Scott failed to support his allegation that Mr. Torres had a later seniority date than him. *Id.* at *5–6. Mr. Scott's second count alleged retaliation on the basis that he was not given driving assignments due to previously filed grievances. *Id.* at *7. This too the presiding court rejected for various reasons, resulting in summary judgment for UPS. *Id.* at *10.

On June 27, 2022, Mr. Scott filed the instant Complaint. Dkt. 1. Following the Court's Order (Dkt. 13) on UPS's Motion to Dismiss (Dkt. 9), Mr. Scott is left with Count I—racial discrimination in violation of 42 U.S.C. § 1981 for promoting Mr. Cantu prior to Mr. Scott. *Id.* at 3. UPS now moves for summary judgment. Dkt. 25.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

5

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine factual dispute. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the non-moving party. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). In addition, the Court must resolve any reasonable doubts in the

non-moving party's favor. *Id.* Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

## DISCUSSION

"Title VII prohibits employers from discriminating 'against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008) (quoting 42 U.S.C. § 2000e-2(a)(1)). 42 U.S.C. § 1981 specifically prohibits employers from discriminating against employees on the basis of race. *Wesley v. Austal USA, LLC*, 776 F. App'x 638, 643 (11th Cir. 2019). Notwithstanding this distinction, "[c]laims of race discrimination under § 1981 are [generally] analyzed in the same manner as those brought under Title VII." *Id.* (citing *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1060 (11th Cir. 1994)).[2]

Where, as here, there is no direct evidence of racial discrimination, a plaintiff can establish a circumstantial § 1981 claim by showing that: "'(1) [he] is a member of a protected class; (2) [he] was subjected to adverse employment action; (3) [his] employer treated similarly situated [non-African American] employees more

---

[2] "Unlike a Title VII discrimination claim—where a lesser 'motivating factor' standard sometimes applies—a § 1981 claim requires proof that race was a but-for cause of a termination [or adverse employment action]." *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1014 (11th Cir. 2023).

favorably; and (4) [he] was qualified to do the job.'" *McCann*, 526 F.3d at 1373 (quoting *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000)). If the plaintiff makes this *prima facie* case, "the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its action." *Wesley*, 776 F. App'x at 643. Only if the employer does so does the plaintiff then have to "show that the employer's stated reasons were pretexts for unlawful discrimination." *Id.*

Here, Mr. Scott has failed to make a *prima facie* case. There is no dispute that promotion at UPS is seniority-based under the CBA and Southern Supplement. Dkt. 25-5 at 5. Additionally, at this point, UPS has demonstrated that there is no genuine issue of fact concerning whether Mr. Cantu's seniority date is earlier than Mr. Scott's. Dkt. 25-9 at 2; *see also* 25-11 at 27–28 (UPS's Counsel: "Does Anthony Cantu have an earlier seniority date than you?" Mr. Scott: "Yes."). Mr. Scott's ability to demonstrate an adverse employment action and more favorable treatment of Mr. Cantu therefore depends upon his ability to—at the very least—go beyond the pleadings and "identify affirmative evidence" of Mr. Cantu's alleged accident. *Crawford-El*, 523 U.S. at 600. Without this, no reasonable jury could find that Mr. Scott was entitled to the job that Mr. Cantu received (adverse employment action) or that Mr. Cantu was treated more favorably on racial grounds. The evidence and facts agreed upon by both parties could only show that UPS was following its race-neutral policy for promotion.

8

Following discovery, Mr. Scott has identified absolutely no affirmative evidence of Mr. Cantu's alleged accident. In fact, he admittedly has no firsthand knowledge concerning the accident or details to share about it:

> **Q**: Okay. So you've mentioned that Anthony Cantu was in a car accident. How did you learn about the car accident?
>
> **A**: I'm trying to remember which one it was either from Joey Howard, or Allen Lucciola, or Robert Levitt, as well as a bunch of other drivers. That's just what people do at the job. They go and talk and whisper about what's going on around and that whoever got in a car accident or if they were disqualified.
>
> **Q**: Do you know what year the car accident was?
>
> **A**: Not is specific details. No.
>
> **Q**: Do you know who caused the accident?
>
> **A**: At UPS it's not about who caused it. It's about if it could have been avoidable, and, so, I do know it was an avoidable accident. Yes.
>
> **Q**: How do you know it was an avoidable accident?
>
> **A**: Just based on what the Union said. I hadn't seen any of the documents or anything like that.
>
> **Q**: Who makes a determination as to whether an accident is avoidable?
>
> **A**: I'm not exactly sure to be honest with you.
>
> **Q**: Have you spoken to Anthony Cantu about his accident?
>
> **A**: No.

Dkt. 25-11 at 14–15. Mr. Scott simply claims, without citation to record evidence, that "Anthony Cantu was disqualified from driving for a one-year period after he

was involved in an avoidable vehicle accident." Dkt. 26 at 3. This is akin to relying on the bare pleadings. And factually unsupported allegations of this nature cannot form the entire basis for a § 1981 claim. *Echols v. Home Depot U.S.A., Inc.*, 208 F. App'x 747, 748 (11th Cir. 2006) (affirming summary judgment where the court "[found] nothing in the record, other than [plaintiff's] own unsupported claims, to support" a necessary element of his § 1981 claim). They are properly disposed of at the summary judgment stage. *See Celotex*, 477 U.S. at 323–24 (finding that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses").

Even if Mr. Scott had identified evidence of the alleged accident, though, another problem persists. Namely, Mr. Scott has failed to produce any evidence that accidents disqualify UPS bargaining unit employees from promotion or that they impact seniority status under the CBA and/or Southern Supplement. The Southern Supplement explicitly provides that "[s]eniority shall be broken **only** by discharge for cause, voluntary quit, layoff for a period of three (3) years from the last date of employment, failure to respond to notice of recall, or unauthorized leave of absence." Dkt. 25-5 at 5 (emphasis added). Mr. Scott points to no provision that might suggest otherwise. Rather, he merely states, again with no citation to record evidence, that "[p]ursuant to the requirements of the bargaining agreement, Anthony Cantu was disqualified [due to his alleged accident]." Dkt. 26 at 3.

10

In light of the foregoing discussion, there is no evidence from which a reasonable jury could find that Mr. Cantu was disqualified or that Mr. Scott was entitled to the job Mr. Cantu ultimately received. It follows that Mr. Scott has not shown that he suffered an adverse employment action or unfavorable treatment.[3] The Court grants summary judgment to UPS.

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED**:

(1) UPS's Motion for Summary Judgment (Dkt. 25) is **GRANTED**.

(2) The Clerk is directed to enter judgment in favor of UPS and close this case.

**DONE AND ORDERED** at Tampa, Florida, on November 17, 2023.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record

---

[3] As a final matter, the Court notes that Mr. Teimer's failure to post the subject position for bidding is of no consequence to Mr. Scott's § 1981 claim. Because Mr. Scott has not identified evidence suggesting that Mr. Cantu was actually disqualified, Mr. Cantu, as the most senior bargaining unit employee, would have been given the first opportunity to accept the job under the CBA and Southern Supplement regardless. What is more, Mr. Teimer did not post Mr. Scott's current job either. He directly approached Mr. Scott, like he did Mr. Cantu, and offered him the job.